UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DIANE M. ARD, AS EXECUTRIX FOR | : | |
| THE ESTATE OF ROBERT J. ARD, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 3-04-cv-2155 (JCH) |
| METRO-NORTH RAILROAD | : | |
| COMPANY, | : | |
| Defendant. | : | JUNE 5, 2007 |

**RULING RE: MOTION FOR JUDGMENT AS A MATTER OF LAW (Doc. No. 173) AND MOTION FOR A NEW TRIAL (Doc. No. 174)**

## I.       INTRODUCTION

Plaintiff Diane M. Ard, as the Executrix of the Estate of Robert J. Ard, Jr. ("Mrs. Ard"), brought this action against the defendant, the Metro-North Railroad Company ("Metro North"), pursuant to the Federal Employer's Liability Act (FELA), 45 U.S.C. § 51, et seq.  Mrs. Ard sought damages for the alleged wrongful death, conscious pain, and mental anguish suffered by Robert J. Ard, the deceased ("Mr. Ard").  This suit arose from Mr. Ard's fatal accident on the evening of March 9, 2004 at Metro North's train yard in Stamford ("Stamford Yard").  Three members of a Metro North switching crew were involved in the accident: Mr. Ard, an Assistant Conductor, Ray Durkin, a Conductor, and Phil Waisonovitz, an Engineer.  That evening, Mr. Ard was run over and killed by a train he was directing and which Waisonovitz was operating.

At the conclusion of a seven-day trial, the jury found that Metro North negligently caused Mr. Ard's death in that: 1) Metro North's managers failed to properly supervise yard crews in Stamford Yard by not enforcing Metro North Operating Rules in Stamford Yard; 2) Conductor Durkin failed to properly supervise his own yard crew at the time of

Mr. Ard's accident; and 3) Waisonovitz moved the train involved in Mr. Ard's accident without proper radio instructions to do so. The jury also found that Mr. Ard's own negligence was a contributing cause of his death in that: 1) Mr. Ard failed to ride in the train's lead cab on the final move, choosing instead to stay on the ground to direct the final move; and 2) Mr. Ard turned his back to the train involved in the accident and walked in the gage of the track. Having found that both Metro North and Mr. Ard negligently caused Mr. Ard's death, the jury apportioned seventy-five percent of the fault for Mr. Ard's death to the actions of Metro North and twenty-five percent of this fault to Mr. Ard.

As to damages, the jury granted a total award of $4,344,053. The jury concluded that $2,978,582.00 would compensate Mrs. Ard for the lost earnings and other financial benefits that Mr. Ard would have received from Metro North. The jury then awarded $279,458.00 for the lost services that Mr. Ard would have provided to his family. Lastly, the jury determined that Mrs. Ard was entitled to $1,086,013.00 for the loss of Mr. Ard's care to his two minor children. The jury declined to award damages for any conscious pain and mental anguish that Mr. Ard may have experienced. Based on the jury's negligence apportionment, the court reduced the total damages award to reflect Mr. Ard's twenty-five percent contributory negligence, resulting in a final sum of $3, 258, 039.20.

Metro North now moves pursuant to Fed.R.Civ.P. 50 and 59 to have the verdict against it reversed or, in the alternative, to receive a new trial.

## III.    MOTION FOR JUDGMENT AS A MATTER OF LAW

### A.    Standard

Rule 50(b) of the Federal Rules of Civil Procedure allows for the entry of judgment as a matter of law if a jury returns a verdict for which there is no legally sufficient evidentiary basis.  See Fed. R. Civ. P. 50.  The standard under Rule 50 is the same as that for summary judgment:  A court may not grant a Rule 50 motion unless "the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached."  This Is Me, Inc. v. Taylor, 157 F.3d 139, 142 (2d Cir. 1998) (citation and internal quotation marks omitted).  Thus, in deciding such a motion, "the court must give deference to all credibility determinations and reasonable inferences of the jury . . . and it may not itself weigh the credibility of the witnesses or consider the weight of the evidence."  Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 289 (2d Cir. 1998) (citations omitted).  In short, the court cannot "substitute its judgment for that of the jury."  LeBlanc-Sternberg v. Fletcher, 67 F.3d 412, 429 (2d Cir. 1995) (citations omitted).  Rather, judgment as a matter of law may only be granted if:

> (1)    there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or

> (2)    there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded persons could not arrive at a verdict against it.

Galdieri-Ambrosini, 136 F.3d at 289 (quoting Cruz v. Local Union No. 3 of the Int'l Bhd.

of Elec. Workers, 34 F.3d 1148, 1154 (2d Cir. 1994)) (internal quotation marks omitted); see also Luciano v. Olsten Corp., 110 F.3d 210, 214 (2d Cir. 1997).

Moreover, "weakness of the evidence does not justify judgment as a matter of law; as in the case of a grant of summary judgment, the evidence must be such that 'a reasonable juror would have been compelled to accept the view of the moving party.'" This Is Me, Inc., 157 F.3d at 142 (quoting Piesco v. Koch, 12 F.3d 332, 343 (2d Cir. 1993)). The court "must view the evidence in the light most favorable to the party in whose favor the verdict was rendered, giving that party the benefit of all reasonable inferences that the jury might have drawn in his favor." Norton v. Sam's Club, 145 F.3d 114, 118 (2d Cir. 1998) (citation omitted); see also Mickle v. Morin, 297 F.3d 114, 120 (2d Cir. 2002) (court must draw all reasonable inferences in favor of the non-moving party). Additionally, in making its determination, the court "'must disregard all evidence favorable to the moving party that the jury is not required to believe.'" Mickle, 297 F.3d at 120 (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151 (2000)). Thus, "[a] party seeking to overturn a verdict based on the sufficiency of the evidence bears a very heavy burden." Norton, 145 F.3d at 118.

**B.     Discussion**

Metro North argues that this court should set aside the verdict because critical portions of the testimony of Mrs. Ard's railroad safety expert, George Gavalla, should have been stricken, and, absent Gavalla's improper testimony, there is insufficient evidence in the record to support the verdict. Alternatively, Metro North contends that this court must overturn the jury's award of damages for Mr. Ard's lost care.

4

## 1.      Admissibility of Expert Testimony

Under Federal Rule of Evidence ("FRE") 702, which governs the admissibility of expert testimony, the court may admit the testimony of an appropriately qualified expert if that expert's "scientific, technical, or other specialized will assist the trier of fact to understand the evidence or determine a fact in issue."  One of the major purposes of FRE 702 is to ensure that the expert testimony at issue is "helpful to the jury in comprehending and deciding issues beyond the understanding of a layperson."  DiBella v. Hopkins, 403 F.3d 102, 121 (2d Cir. 2005).  In assisting the jury with the issues it must determine, the expert's testimony must not "usurp[ ] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it."  Nimely v. City of New York, 414 F.3d 381, 397 (2d Cir. 2005) (quoting United States v. Bilzerian, 926 F.2d 1285, 1294 (2d Cir. 1991)) (internal quotations omitted).  Such testimony, by its very nature, does not assist the jury because it "undertakes to tell the jury what result to reach, and thus attempts to substitute the expert's judgment for the jury's."  Id. (quoting United States v. Duncan, 42 F.3d 97, 101 (2d Cir. 1994).

Metro North first asserts that this court should not have permitted Gavalla to express opinions concerning which Metro North safety and operating rules governed the switching crew's conduct at the time of Mr. Ard's accident, the proper interpretation of Metro North's safety and operating rules, or whether and by whom these rules were violated.  Def. Post-Trial Mem. at 23 (citing DeGregorio v. Metro-North R.R. Co., 2006 WL 3462554 (D. Conn. 2006).  According to Metro North, the court should have excluded this testimony because it expressed a legal conclusion, thus abdicating the

5

respective roles of the court and jury.  Id. at 25 (citing Bilzerian, 926 F.2d at 1294).

Metro North is correct in that, at trial, Gavalla testified as to whether particular

Metro North safety rules applied and were violated at the time of Mr. Ard's death.  See,

e.g. Trial Tr. at 261-61; 264-67; 272.  Metro North is incorrect, however, in its assertion

that Metro North's safety and operating rules constitute legal standards.  In fact, the

court specifically instructed the jury that Metro North's operating rules did not

necessarily establish the applicable legal standard in this case:

> In addressing the question of negligence, you may consider the evidence which
> was presented concerning Metro North's Operating Rules.  If you find that there
> were such rules, they may indicate recognition of a hazard and the means to
> avoid it.  You may consider the existence of operating rules as one indication of
> what may be reasonable in a given situation.  However, they are not the only
> indication.  You may also find that one or more of Metro North's operating rules
> do not reflect the level of care which a reasonably prudent person would take
> and that, although an operating rule was followed, Metro North was negligent.

Jury Charge No. 20.

The court also notes that the cases Metro North cites for the proposition that

Gavalla's testimony concerning Metro North's operating rules amounted to legal

conclusions all deal with situations where an expert provided opinions regarding the

violation of federal laws or regulations.  See, e.g., In Re Air Disaster at Lockerbie,

Scotland, 37 F.3d 804, 826-27 (2d Cir. 1994) (excluding expert testimony on FAA

regulations); United States v. Scop, 846 F.2d 135, 140 (2d Cir. 1988) (excluding expert

testimony relying directly on language in statute and accompanying regulations on

securities manipulation and fraud).  Nowhere in his trial testimony did Gavalla opine on

legal standards, such as who was ultimately responsible for Mr. Ard's death.  Therefore,

the court finds no error in having allowed Gavalla to testify about the applicability of

Metro North's safety and operating rules.

Next, Metro North contends that this court erred in permitting Gavalla to testify that Engineer Waisonovitz moved the train involved in this incident without receiving a proper radio instruction to do so from Mr. Ard, despite Waisonovitz's denial of this fact. In Metro North's view, Gavalla's testimony amounted to an impermissible evaluation of Waisonovitz's credibility. See Nimely, 414 F.3d at 397-98 (discussing FRE 702 prohibition on expert opinions evaluating witness credibility).

At the pretrial conference held on January 26, 2007, the court, ruling on the same issue urged here in Metro North's Motion in Limine to Exclude the Expert Testimony of George Gavalla (Doc. No. 62 at 5, 9), stated, "I don't want to hear from [Gavalla] about whether he thinks someone is telling the truth or not. He can be questioned, it seems to me, within the scope of his expertise as to why something that your purporting to claim is true [or] can't be true." Continued Pretrial Conference Tr. at 143. Gavalla's testimony detailing the facts upon which he based his conclusion that Waisonovitz moved the train without a proper instruction was clearly within the parameters of the court's pretrial ruling. See Trial Tr. at 280-81. Even when Metro North's counsel directly cross examined Gavalla as to whether his conclusions about Waisonovitz's improper movement of the train merely reflected Gavalla's personal beliefs about Waisonovitz's credibility, Gavalla replied, "I believe that the other information that I looked at was not supportive of [Waisonovitz's claim]." Id. at 365.

Where Gavalla's testimony did begin to stray into an assessment of the accuracy of Waisonovitz's statements to the Metro-North Police Department, the court sustained Metro North's timely objection. Id. at 291-92. However, Metro North failed to move to

strike any potentially offending portion of Gavalla's testimony.  Id. at 292.  Thus, looking

to Gavalla's testimony as a whole, the court concludes that Gavalla's testimony

regarding Waisonovitz's operation of the train did not improperly opine on Waisonovitz's

credibility.

Metro North's final contention concerning Gavalla's expert testimony is that

Gavalla simply advocated Mrs. Ard's version of the facts.  Def. Post-trial Memo. at 26

(citing In Re Rezulin Products Liability Litigation, 309 F. Supp.2d 531, 551 (S.D.N.Y.

2004).  The court finds no evidence to support Metro North's conclusory allegation.  As

such, the court holds that Metro North is not entitled to relief on this basis.

## 2.    Sufficiency of Evidence Absent Challenged Expert Testimony

Metro North argues that, in the absence of Gavalla's testimony, no rational jury

could conclude that Metro North was liable for Mr. Ard's death.  Even if this court

agreed that Gavalla's testimony should have been stricken in the manner asserted by

Metro North, the court concludes that Metro North cannot prevail on its burden to

demonstrate that the remaining evidence in the record is insufficient to support the

verdict.

As to the jury's conclusion that Metro North failed to enforce its operating rules in

Stamford yard, the evidence at trial was limited to Metro North's adherence to

Operating Rule 38.  Rule 38 states, in relevant part, that "[w]hen making a movement

with passenger equipment and the engineer is operating from other than the lead end .

. . [the] Conductor or qualified crew member will be located in the leading cab in the

direction of the movement."  Based on the trial evidence, the jury could have concluded

that Rule 38 applied to switching moves in Stamford Yard.  See, e.g. Trial Tr. at 100-01

8

(reading deposition testimony of Mr. Parsons, Metro North's Director of Operating Rules and Rules Examiner).  The jury further could have reasonably surmised that Metro North's managers and officials did not enforce Rule 38 in Stamford Yard, id. at 737, 830; Ex. 56 at 7-8; Ex. 57 at 58-59, that they were negligent for not doing so, and that this negligence caused Mr. Ard's death.  Although the jury also determined that Mr. Ard violated Rule 38 by not riding in the lead cab, this is consistent with the notion that Mr. Ard did not follow Rule 38 because of Metro North's failure to enforce the Rule in Stamford Yard.  In effect, the jury appears to have reached the unremarkable conclusion that both Mr. Ard and Metro North were to blame for Mr. Ard's failure to abide by Rule 38.  The court thus finds that there is sufficient evidence in the record to support the jury's finding that Metro North negligently caused Mr. Ard's death by not enforcing Rule 38 in Stamford Yard.

Concerning the jury's determination that Conductor Durkin's negligent failure to supervise his crew was a causal factor in Mr. Ard's death, the evidence at trial established that, under Rule 490, Metro North conductors are obligated to be "responsible for the prompt movement, safety and care of their trains, for the vigilance, conduct and proper performance of duty of train employees, and for the observance and enforcement of all rules and instructions."  There is also no dispute that, at the time of Mr. Ard's death, Durkin was attending to a separate track and essentially ignoring the fatal switching move.  Given Rule 490, it seems reasonable for the jury to have found that Durkin's behavior was negligent.  Certainly, the jury may also have concluded that Durkin was not negligent, especially given the evidence that the switching moves involved in Mr. Ard's accident could have been performed safely by just Mr. Ard and

9

Waisonovitz and that no operating rules required that Durkin be on the train with his switching crew. However, the court is not entitled to set aside a verdict simply because other evidentiary conclusions were plausible, or even more likely. The jury's findings concerning Durkin's liability are fairly supported by competent evidence in the record and, as such, should be allowed to stand.

The court next turns to the jury's conclusion that Waisonovitz improperly moved the train without a proper radio instruction. As the trial evidence revealed, Metro North's Operating Rule 434 requires that, during a shoving move, the person directing the move should communicate the distance the train is to travel. Tr. Ex. 42. The Engineer should stop the move if he does not receive any further communication after moving the train one half of the specified distance. Id. Under Rule 435, if a complete instruction is not given, the Engineer should not move the train at all. Trial Tr. at 272.

Waisonovitz maintained that he did receive a radio instruction from Mr. Ard to shove the train along the move that ultimately killed Mr. Ard. However, there were a number of reasonable inferences available to the jury that would have undermined Waisonovitz's credibility on this point. Mrs. Ard adduced testimony or statements from a number of Metro North employees at Stamford yard the morning of Mr. Ard's death who, despite having heard earlier radio communications by Ard, did not hear Mr. Ard give an instruction for Waisonovitz shove the train on its final move. The most notable of these employees is Conductor Durkin, who was in charge of Mr. Ard's switching crew. Trial Tr. at 155, 168. In addition, Edward Usarzewicz, a Foreman in Metro North's Mechanical Department, recalled hearing Mr. Ard inform General Foreman Christopher Juncker that an engine was dead and then hearing Juncker reply to Ard

10

when the engine had been repaired.  Id. at 210, 212.  That conversation occurred

shortly before the fatal accident.  Usarzewicz did not hear any other communications

involving Mr. Ard until after Mr. Ard's accident, when Durkin called for emergency

assistance.  Though the evidence could have persuaded the jury that the other

employees' inability to recall a radio command from Ard did not necessarily mean that

such a communication did not occur, it could just as reasonably have persuaded the

jury to infer that the employees' inability to recall a radio command indicates that Mr.

Ard never instructed D  urkin to initiate the fatal maneuver.

It is also quite plausible that the jury simply discredited Waisonovitz's testimony

on its own terms.  During Metro North's investigation of the accident, Waisonovitz

provided a statement in which he claimed that, after moving the train approximately

three to four car lengths, Ard radioed him to "keep coming west we are all lined."  Pl.

Ex. 30.  On cross examination, however, Waisonovitz stated that he believed Ard had

already been struck when he moved the train three to four car lengths.  Trial Tr. at

1379.  This inconsistency could have served to undermine Waisonovitz's credibility to a

great extent.  In addition, Waisonovitz revealed that he was suing Metro North for the

post-traumatic stress disorder he allegedly suffered as a result of Mr. Ard's accident.

The jury most certainly could have reasoned that Waisonovitz's pending lawsuit gave

him a substantial motive to paint the events surrounding Mr. Ard's death in a light most

favorable to Waisonovitz.  Consequently, the court finds sufficient evidence to support

the jury's finding that Waisonovitz moved the train without a proper instruction from Mr.

Ard.

### 3. Jury's Award of Damages for Loss of Care

The last ground for Metro North's Rule 50 motion is that the jury improperly awarded Ms. Ard $1, 086, 013 for the loss of Mr. Ard's care to his two minor children. The court agrees. Under FELA, "the measure of recovery is the damages . . . [that] flow from the deprivation of the pecuniary benefits which the beneficiaries might have reasonably received . . . ." Norfolk and W. Ry. Co. v. Liepelt, 444 U.S. 490, 493 (1980) (quoting Michigan Central R. Co. v. Vreeland, 227 U.S. 59, 70 (1913)) (internal quotations omitted). The Supreme Court has long held that "[a] pecuniary loss or damage must be one which can be measured by some standard." Michigan Central, 227 U.S. at 71. Accordingly, FELA plaintiffs are not entitled to recover for the "inestimable loss of the society and companionship of the deceased relative upon which, in the nature of things, it is not possible to set a pecuniary valuation." Id. Despite Michigan Central's concern with ensuring that the damages awarded to FELA plaintiffs in wrongful death suits be susceptible to objective valuation, the Supreme Court explicitly permitted recovery "for the loss of that care, counsel, training, and education which [the beneficiary's children] might, under the evidence, have reasonably received from the parent, and which can only be supplied by the service of another for compensation." Id.

Mrs. Ard admittedly provided no objective criteria from which the jury could arrive at sum for loss of care damages. Nevertheless, Mrs. Ard maintains that, in order to receive damages for loss of care, "[a]ll that is needed is for the record to contain evidence of 'the personal qualities of the deceased and the interest he took in his family.'" Pl. Opposition at 6 (quoting Norfolk & W. Ry. Co. v. Holbrook, 235 U.S. 625,

12

629 (1915)).  To this end, Mrs. Ard notes that her testimony is replete with evidence of

Mr. Ard's personal qualities and the interest he took in his two daughters.  Mrs. Ard then

presses that the Supreme Court's holding in Holbrook does not require plaintiffs to

suggest specific economic values or present expert testimony for the jury to arrive at an

appropriate sum for loss-of-care damages.  According to Mrs. Ard, the jury may

properly tally loss-of-care damages through reliance on their "common sense and

knowledge of the everyday affairs of life."  Pl. Opp. at 7.

The difficulty with Mrs. Ard's argument is that Holbrook does not seem to support

her broad interpretation of the proof that will sustain damages for loss of care.  As Mrs.

Ard correctly notes, the Holbrook court held that:

> It [is] proper, therefore, to charge that the jury might take into consideration the
> care . . . which the evidence showed [the deceased] might have been expected
> to give his children during their minority, and to include the pecuniary value
> thereof in the damages assessed.

Holbrook, 235 U.S. at 629.  While this excerpt might superficially suggest that FELA

plaintiffs need not affirmatively put forward evidence establishing the pecuniary value of

the deceased's loss of care, it is important to note, as Mrs. Ard does, that the Supreme

Court's decision in Holbrook was an extension of the Court's decision in Michigan

Central.  See id. (discussing Michigan Central, 227 U.S. at 68, 72, 73).  In Michagan

Central, the Court held that it was error to instruct a jury that it might estimate damages

for loss of care "from their own experiences as men."  Michigan Central, 227 U.S. at 74.

Just as it was inappropriate for the trial court in Michigan Central to leave the loss-of-

care valuation to the experience of the jury, this court cannot allow a loss-of-care

damages award to stand when the only potential source of pecuniary value would be

the jurors' own common sense and everyday experience.  The court therefore finds that

the jury's award to Mrs. Ard for the loss of Mr. Ard's care to his minor children must be

set aside as a matter of law.

## IV.     MOTION FOR A NEW TRIAL

### A.     Standard

Under Rule 59, a new trial "'should be granted when, in the opinion of the district

court, the jury reached a seriously erroneous result or . . . the verdict is a miscarriage of

justice.'"  DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d 124, 133 (2d Cir. 1998)

(quoting Song v. Ives Labs., Inc., 957 F.2d 1041, 1047 (2d Cir. 1992)).  "A new trial may

be granted, therefore, when the jury's verdict is against the weight of the evidence."  Id.

This standard differs from the Rule 50 standard in two significant ways:

> Unlike judgment as a matter of law, a new trial may be granted even if
> there is substantial evidence supporting the jury's verdict.  Moreover, a
> trial judge is free to weigh the evidence [herself], and need not view it in
> the light most favorable to the verdict winner.

Id. at 134 (citation omitted).  However, "a court should rarely disturb a jury's evaluation

of a witness's credibility."  Id.  "'A motion for a new trial ordinarily should not be granted

unless the trial court is convinced that the jury has reached a seriously erroneous result

or that the verdict is a miscarriage of justice.'"  Caruolo v. John Crane, Inc., 226 F.3d

46, 54 (quoting Atkins v. New York City, 143 F.3d 100, 102 (2d Cir. 1998)).

### B.     Discussion

Metro North bases its request for a new trial on this court's pretrial imposition of

sanctions against Metro North.  These sanctions limited Metro North's ability to

challenge an aspect of Mrs. Ard's evidence.  Metro North also moves for a new trial on

what it claims to be the jury's unreasonable apportionment of liability between Metro North and Mr. Ard.

### 1. Court Sanctions Imposed on Metro North

The switching move involved in the accident originally called for the team to move six cars from Track 20 and take them to Track 22. The team was then to pick up two additional cars Track 22 and move all eight cars back to Track 20. In order to make each required move, the front end of the train, defined by the end of the train that would first move on to the new track, had to clear the L1/L2 switch.

One aspect of Mrs. Ard's proof that Waisonovitz did not receive a radio instruction from Mr. Ard to begin the train's final move was a reenactment by Metro North conducted after Mr. Ard's accident. This simulation, which attempted to replicate the shoving moves completed by Mr. Ard's switching crew, suggested that the train did not clear the L1/L2 switch after the team pushed the eight cars from Track 22 back in order to return to Track 20. Specifically, Metro North's reenactment concluded that the train stopped sixty-one feet short of clearing the L1/L2 switch. A memo detailing the reenactment by Metro North Foreman Riley (the "Riley Memo") stated that the margin of error for Metro North's measurements was 52.8 feet. Thus, even allowing for this margin of error, the reenactment found that the train could not have cleared the L1/L2 switch.

Relying on the testimony of several witness, including two expert witnesses, Mrs. Ard posited that, if the cars did not clear the L1/L2 switch, Mr. Ard would have had no reason to instruct Waisonovitz to push the train back. This is because Mr. Ard knew that requesting to shove the train would have resulted in the train simply returning to

Track 22.  In addition, Mrs. Ard contended that such an instruction by Mr. Ard was wholly implausible given that Mr. Ard was on the gage of Track 22 with his back to the train at the time of his accident.  Put plainly, Mr. Ard would not have instructed Waisonovitz to run him over.

At a <u>Daubert</u> hearing held on the eve of trial, Metro North sought to introduce testimony establishing that the margin of error for Metro North's measurements was actually 369 to 422 feet.  Such evidence would have supported Metro North's contention that the train did, in fact, clear the L1/L2 switch.  This would have permitted Metro North to argue that Mr. Ard did signal for Waisonovitz to push the train back.  If this signal only resulted in the training returning to Track 22, it would have been because Mr. Ard simply failed to throw the L1/L2 switch after the train cleared the switch.

After considering the time line of Metro North's disclosures with respect to the margin of error involved in the reenactment, the court found that Metro North had committed a discovery abuse.  This determination was based on the facts that Metro North never amended its interrogatory responses to reflect its actual position with regard to the margin of error, as required by Rule 26(e)(2) of the Federal Rules of Civil Procedure.  The court was also persuaded by the fact that Metro North consistently represented to Mrs. Ard that the margin of error was 52.8 feet.  Pursuant to its authority under Rule 37(c), the court concluded that Metro North was prohibited from eliciting any testimony suggesting that the margin of error was anything other than what Metro North

had repeatedly stated it was throughout discovery: 52.8 feet.[1]  This sanction applied to

evidence introduced in Metro North's case in chief, and to evidence Metro North may

have adduced through cross examination.

With the instant motion, Metro North essentially reargues its original objections

that sanctions were inappropriate and, alternatively, that the sanction of preclusion was

drastic and unwarranted.  The court sees no reason to disturb its initial ruling.  As the

court reasoned at the Daubert hearing:

> It is the court's view, that you cannot repeatedly answer discovery whether
> interrogatories, request for production, uncorrected deposition testimony or
> memorandum of law filed with the court . . . saying that A is a fact and then in
> effect come to trial and say not A is the fact.  And the court knows of no other
> way in this case to cure that practice the defendant engaged in other than by
> precluding certain testimony . . . [T]he court sees a very real harm here to the
> plaintiff and its ruling is designed to minimize that harm.

Daubert Hearing Tr. at 16-17.

At trial, Metro North was able to introduce its own expert testimony

(Hintersteiner) establishing Metro North's trial view of the distance the train moved on

its last shove.  To reach this conclusion, Hintersteiner relied on Metro North's data

showing the length of time the train traveled along the final move, and the speed at

which the train traveled during this interval.  Simply multiplying the speed and distance

would yield the distance the train traveled on the last move, and, having done so

himself, Hintersteiner found that the train did clear the L1/L2 switch.  Even if Metro

North could not directly impeach its conclusions from the earlier reenactment, the jury

still could have concluded that Hintersteiner's speed/time calculation of distance was

---

[1]The court's reasons for this ruling are set forth in greater detail in the record.

the more accurate methodology.  This consideration mitigates the obvious harm to

Metro North from the court's sanction, while still serving as a stiff deterrent to litigants

who fail to amend critical discovery responses.  The court therefore finds that Metro

North is not entitled to a new trial on this basis.

### 2.    Jury's Apportionment of Liability

Metro North next asserts that this court must order a new trial to correct the jury's

finding that Mr. Ard's negligence accounted for only twenty five percent of the

responsibility for his accident.  According to Metro North, the 75/25 apportionment of

fault between Metro North and Mr. Ard, respectively, was against the weight of the

evidence.  Metro North further suggests that the jury's apportionment represented a

compromise verdict, since the jury's $1, 086, 013 award for lost care was also twenty-

five percent of the total damages awarded to Mr. Ard.

The court finds that the jury's allocation of negligence is neither seriously

erroneous nor a miscarriage of justice.  The jury effectively found that Mr. Ard was

negligent for not following Rule 38 and for walking in the gave of Track 22 while turning

his back to the train.  As the court has discussed, it was reasonable for the jury to

conclude that Mr. Ard and Metro North shared responsibility for Mr. Ard's failure to

follow Rule 38.  If the jury concluded that Mr. Ard did not give Waisonovitz a signal to

push the train, it could also have determined that, although Mr. Ard should not have

turned his back to the train, Mr. Ard had taken some steps to protect himself by not

ordering Waisonovitz to move the train.

That the jury's twenty-five percent finding of fault for Mr. Ard equals the

percentage of total damages comprised by the jury's loss-of-care award does not

change the analysis. This outcome could be sheer coincidence. Furthermore, if the

jury was motivated by an improper motive in its verdict, there is no way to eliminate the

possibility that the jury first arrived at its apportionment of fault and then calculated

damages accordingly. While this might endanger the jury's loss of care award, an

award the court has already set aside, it would not disturb its fault allocation. In any

event, the court finds that the jury's fault apportionment is not against the weight of the

evidence in this case. The court therefore finds that Metro North is not entitled to a new

trial on the issue of relative responsibility.

## IV.    CONCLUSION

For the foregoing reasons, Metro North's Motion for Judgment as a Matter of

Law (Doc. No. 173) is GRANTED in part and DENIED in part. It is granted in that the

court will set aside the jury's finding of damages for the loss of Mr. Ard's care. It is

denied in all other respects. Metro North's Motion for a New Trial (Doc. No. 174) is

denied.

## SO ORDERED.

Dated at Bridgeport, Connecticut this 5th day of June, 2007.


 /s/ Janet C. Hall
Janet C. Hall
United States District Judge